Tony CAMPOS, et al.,
Plaintiffs–Appellees
Cross–Appellants,

v.

CITY OF BAYTOWN, TEXAS, et al.,
Defendants–Appellants
Cross–Appellees.

No. 87–2359.

United States Court of Appeals,
Fifth Circuit.

July 7, 1988.

Arthur Val Perkins, Mueller, Oaks & Hartline, Steven C. Oaks, Houston, Tex.,

---

**944**

Randall B. Strong, City Atty., City of Baytown, Baytown, Tex., for defendants-appellants cross-appellees.

Deborah Sterling Burleson, Asst. City Atty., Abilene, Tex., for amicus City of Abilene.

William L. Garrett, Dallas, Tex., Rolando L. Rios, San Antonio, Tex., for plaintiffs-appellees cross-appellants.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, REAVLEY, Circuit Judge, and HUNTER,[*] District Judge.

PER CURIAM:

The Petition for Rehearing is DENIED and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Federal Rules of Appellate Procedure and Local Rule 35) the Suggestion for Rehearing En Banc is also DENIED.

Before CLARK, Chief Judge, GEE, REAVLEY, POLITZ, KING, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, and JONES, Circuit Judges.[**]

[*] District Judge of the Western District of Louisiana, sitting by designation.

[**] Judges Rubin, Johnson and Smith did not participate in the en banc poll.

1. "Language minority citizens" refers to those persons who are Asian American, American Indian, Asian natives, or Spanish heritage.

Based on usage by the Bureau of the Census, the category of Asian American includes persons who indicated their race as Japanese, Chinese, Filipino, or Korean. The category of American Indian includes persons who indicated their race as Indian (American) or who did not indicate a specific race category but reported the name of an Indian tribe. The

HIGGINBOTHAM, Circuit Judge, with whom GEE, GARWOOD, JOLLY, DAVIS and JONES, Circuit Judges, join dissenting from denial of rehearing en banc:

Today this court refuses to consider en banc whether the protections of the Voting Rights Act extended to Blacks and Hispanics also apply to a newly defined minority—a *coalition* of Blacks and Browns. The court thus accepts this simple statement in the panel opinion:

> There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics. Section 1973(a) protects the right to vote of both racial and language minorities. *See* 42 U.S.C. §§ 1973(a), 1973b(f)(2). Congress itself recognized "that voting discrimination against citizens of language minorities is pervasive and national in scope," 42 U.S.C. § 1973b(f)(1), and similar discrimination against Blacks is well documented. If, together, they are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the [*Thornburg v.*] *Gingles* [478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)] threshold as potentially disadvantaged voters.

*Campos v. City of Baytown,* 840 F.2d 1240, 1244 (5th Cir.1988). This is a disturbing reading of a uniquely important statute, and one with the potential to affect the very structure of every school district, county, and city government in most states of this nation.[1] It is puzzling then that the

population designated as Alaskan Native includes persons residing in Alaska identified themselves as Aleut, Eskimo, or American Indian. Persons of Spanish heritage are identified as (a) "persons of Spanish language" in 42 States and the District of Columbia; (b) "persons of Spanish language" as well as "persons of Spanish surname" in Arizona, California, Colorado, New Mexico and Texas; and (c) "persons of Puerto Rican birth or parentage in New Jersey, New York and Pennsylvania." Letter from Meyer Zitter, Chief Population Division, Bureau of the Census, to House Judiciary Committee, April 29, 1975.

panel opinion cites no authority and offers no reasoning to support its fiat.

To the contrary, the pronouncement, despite its Olympian ring, is no more than the result of asking the wrong question. The question is not whether Congress in the Voting Rights Act intended to *prohibit* such coalitions; instead, the proper question is whether Congress intended to *protect* those coalitions. A statutory claim cannot find its support in the absence of prohibitions. Playing with the structure of local government in an effort to channel political factions is a heady game; we should insist that Congress speak plainly when it would do so. Thus, even if the panel had attempted to support its fiat with inferences of intent gleaned from the statute, it would not have been proper to do so.

Despite the panel's conclusion, the fact that Congress extended voting rights protection to language minorities does not answer the question whether Congress intended to extend protection to a group consisting of two distinct minority groups. In deciding to protect language minorities, Congress recognized that language and racial minorities share many disabilities. To assume, however, that a group composed of both minorities is itself a protected minority is an unwarranted extension of congressional intent. A group tied by overlapping political agendas but not tied by the same statutory disability is no more than a political alliance or coalition. I have explained before my concern that so stretching the concept of cohesiveness dilutes its effectiveness as a measure of the causal relationship among the statutory disability, election structures or processes, and election outcomes. *See LULAC v. Midland Independent School District,* 812 F.2d 1494, 1503 (5th Cir.1987) (Higginbotham, J., dissenting). I explained there that:

The purpose of the Act is to redress racial or ethnic discrimination which manifests itself in voting patterns or electoral structures. The tie to race or national origin in Justice Brennan's opinion in *Gingles* is the raw correspondence in votes and outcome. Its three step inquiry assumes a group unified by race or national origin and asks if it is cohesive in its voting. If a minority group lacks a common race or ethnicity, cohesion must rely principally on shared values, socio-economic factors, and coalition formation, making the group almost indistinguishable from political minorities as opposed to racial minorities. At the least, concluding that a political group lacking the cementing and predictive force of common race or national origin is nonetheless politically cohesive under *Gingles* is a difficult undertaking with significant risks. The risks include the reality that diluting the requirement of cohesion expands the mission of the Act beyond the treatment of present-day manifestations of chronic bigotry to a more general device for accommodating majority government and plural constituents—thereby revealing a distrust of the ability of our republican government to do so.

*Id.* at 1504. Although we took *Midland* en banc, we did not reach the issue of cohesiveness because we decided the case on state-law grounds. *See LULAC v. Midland Independent School District,* 829 F.2d 546, 547–48 (5th Cir.1987) (en banc). Nevertheless, the assertion that the groups consolidated in *Midland* were cohesive in the *Gingles* sense was sheer fiction. It was interest-group politics and nothing more; and here we again confuse a cohesive voting minority with protected minorities who sometimes share similar political agendas. In the process, we lose sight of the proper question: whether a vote counts for less because it was cast by a Black or Spanish-surnamed citizen.

The panel's theory also is troubling because it carries the potential to *limit* the protections of the Voting Rights Act in certain contexts. When an aggregation of Blacks and language minorities is sufficiently cohesive, it will presumably repre-

S.Rep. No. 295, 94th Cong., 1st Sess. 24, *reprinted in* 1975 U.S.Code Cong. & Admin.News 774,

790–91 n. 14.

sent *both* groups in the count of minority districts. Where the combined group comprises more than half of a voting population, the panel's approach might permit the group's cohesion in voting to be used as a defense to an attack on an at-large system. Under this analysis, the treatment of two minorities as one could have similar effects on the drawing of district lines. In my view, the possibility that the panel's consolidation theory could be embraced by defendants in future cases raises basic questions of congressional purpose. Stated another way, would this court accept the consolidation theory if it had been made by a city defending against a claim that minority interests of Black or language minorities had been submerged by the way in which the district lines were drawn?

Even if this difficult issue did not demand en banc consideration, we still should review the manner in which the panel analyzed the "cohesiveness" of the consolidated faction. The panel asked only whether Blacks and Browns are cohesive as a group. It did not require that either group, taken individually, vote as a cohesive unit. The panel's approach thus permits a coalition of two groups unrelated to each other by more than a common political agenda, and neither of which itself votes cohesively, to qualify for the protections of the Voting Rights Act. A decision of such importance, even if it is warranted, ought to be made only after consideration by our full court.

Finally, the panel accepts without discussion that the cohesiveness of the combined group need be proven only by a preponderance of the evidence rather than some higher standard, such as clear and convincing evidence. Congress has instructed us to steer between an effects test and proportional representation. This is a course so difficult that use of the lesser standard presents an unacceptable risk of failure. It is not an answer that the parties do not argue for a higher standard; there is no basis for assuming that preponderance of the evidence should be used in the absence of complaint. We should at least explain that we have not decided the point, which we have not.

The Supreme Court's decision in *Gingles* left undecided fundamental questions under the Voting Rights Act. Today we fail to give to protected minorities, district courts, state government, and the bar our best considered reading of the core meaning of legislation that speaks to the essence of our arrangements of governance. We can do better but if we will not, hopefully, the Supreme Court will do so.