Debra NIXON; Johnny Griffin, Sr.; Bill Brown; Juan Jimenez; Sara Ramirez; and Marshall Chavez, on Behalf of themselves and all others similarly situated, Plaintiffs,

v.

KENT COUNTY, MICHIGAN; Kent County Apportionment Commission; and Maurice DeJonge, in his official capacity as Kent County Clerk, Defendants.

No. 1:91–CV–792.

United States District Court, W.D. Michigan.

March 19, 1992.

David E. Hulswit, Jr., Pinsky, Smith, Fayette & Hulswit, James R. Rinck, Grand Rapids, Mich., for plaintiffs.

Mark S. Allard, Scott T. Rickman, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for defendants.

Michael A. McInerney, Gary J. McInerney, Kevin K. Chapman, Gary J. McInerney, PC, Grand Rapids, Mich., for Kent County Democratic Party amicus curiae.

## OPINION

ENSLEN, District Judge.

Pursuant to Federal Rules of Civil Procedure 65(a), plaintiffs seek a preliminary injunction enjoining the implementation of the apportionment plan enacted by defendants for the election districts of the Kent County Board of Commissioners and requiring defendants to implement an apportionment plan including two districts in which minorities comprise effective voting majorities. Plaintiffs—African–Americans and individuals of Hispanic national origin—brought this Voting Rights Act case claiming that defendant Kent County Apportionment Commission (Apportionment Commission) "unlawfully diluted" minority voting strength when it approved its reapportionment plan for County Commission districts following the 1990 census.[1]

### I. Facts

Kent County, Michigan is governed by a Board of Commissioners, and each commissioner is elected from a single member district. Michigan law requires that counties be apportioned into districts following publication of the latest United States official decennial census figures. See Mich. Comp.Laws Ann. § 46.401, et seq. The apportionment must be performed by a county apportionment commission that consists of the County Clerk, the County Treasurer, the Prosecuting Attorney, and the chairs of the two major political parties in the county. See Mich.Comp.Laws Ann. § 46.403. Following publication of the 1990 census, the Kent County Apportionment Commission met and approved an apportionment plan which caused this lawsuit to be filed.

The 1990 census data for Kent County reveals that minorities constitute a total of 54,116 out of a total population of 500,631. Of the total, 438,294 or 87.5% are white; 39,432 or 7.9% are African–American; and 14,684 or 2.9% are Hispanics. African–

Americans and Hispanics comprise 9.2% of the voting age population in Kent County.

Since its inception in 1968, the Board of Commissioners for Kent County has consisted of 21 members. Despite the fact that the 1990 census demonstrated that the population of Kent County had grown significantly—from approximately 444,000 to over 500,000 citizens—, the Apportionment Commission approved a plan that reduced the number of commissioners, and likewise the number of districts, to 19. Defendants submit evidence that under the 1990 census, retention of the 21 district plan would have been malapportioned with district number 6 containing more than 29,000 persons and district number 17 containing less than 21,000 persons. If the 21 district apportionment had been left essentially unchanged, two minority majority districts would not exist.

Under the county's newly adopted apportionment plan, in district 17, African–Americans (66.5%) and Hispanic–Americans (11.80%) make up a clear majority of the voters—78.3%. However, they do not come close to constituting a majority in any of the other newly apportioned districts. No other district contains more than 27% minority voters. Thus, if minority citizens vote as a bloc and white citizens vote as a separate bloc to usually defeat the candidate of the minority citizens' choice, minorities will have an opportunity of electing only one of the 19 county commissioners under the reapportionment plan adopted by the Apportionment Commission, even though minority citizens make up approximately 9.2% of the voting age population of Kent County.

Plaintiffs allege that by maintaining a 21 member commission, two districts can be drawn in which minorities, including African Americans and Hispanics, would comprise effective majorities of 68% and 65%, respectively. Even if the county retained the 21 member commission with 21 districts, there would not be sufficient concen-

1. Pursuant to the parties' agreement, defendants Thomas Shearer, John Boerema, William Forsyth, and Maurice DeJonge in their individual capacities as members of the Kent County Apportionment Commission were dismissed from this action. Only defendants Kent County, Kent County Apportionment Commission, and Maurice DeJonge, acting in his official capacity as Kent County Clerk, remain as defendants in this action.

trations of adult voting African Americans to create two districts containing a majority of African American voters. Nor would there be sufficient concentration of adult Hispanic voters to create even one district with a majority of Hispanic voters.

Plaintiffs contend that the Kent County Apportionment Plan unlawfully limits the ability of minority citizens to elect representatives of their choice, in violation of section 2 of the Voting Rights Act, codified at title 42, section 1973 of the United States Code. Plaintiffs charge defendants with packing district 17 with a larger percentage of minority voters than needed to elect a minority candidate and with splitting or fracturing the remaining minority voters among districts dominated by large white majorities. *See* Plaintiff's Ex. 3–A. Plaintiffs seek a preliminary injunction to enjoin the implementation of the recently adopted reapportionment plan so that their alternative plan can be enacted prior to the next election of county commissioners in 1992.[2]

## II. Standard

In determining whether to issue a preliminary injunction, this Court must consider four factors: 1) the likelihood of success on the merits; 2) irreparable injury to plaintiff that could result if the Court does not grant the requested relief; 3) the possibility of substantial harm to others if the injunction is issued; and 4) whether the public interest would be served by issuing a preliminary injunction. *Id.; Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir.), *cert. denied*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). The Sixth Circuit cautions that these factors should not be viewed as prerequisites to relief, but rather as factors to be balanced. *In re DeLorean*

*Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). The decision whether to issue a preliminary injunction is within the discretion of the district court and is reviewed for abuse of that discretion. *Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 262 (6th Cir.1988). The district court's findings of fact are upheld unless clearly erroneous. *Id.*

The purpose of a preliminary injunction is to preserve the status quo pending final determination of the lawsuit. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). It is an extraordinary remedy not to be invoked unless the movant clearly meets the burden of persuasion regarding the factors to be considered. *Zardui–Quintana v. Richard*, 768 F.2d 1213, 1216, *reh'g denied en banc*, 778 F.2d 793 (11th Cir.1985); *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir.1975); *Roghan v. Block*, 590 F.Supp. 150, 152–53 (W.D.Mich.1984), *aff'd*, 790 F.2d 540 (6th Cir.1986). The Sixth Circuit warns that courts should exercise great caution and careful deliberation in reviewing a motion for a preliminary injunction because " 'there is no power ... more dangerous in a doubtful case than the issuing of an injunction.' " *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir.1972) (quoting 3 Barron & Holtzoff, *Federal Practice and Procedure* (Wright Ed.) § 1431), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973).

## III. Discussion

A. Likelihood of Success on the Merits

Section 2(a) of the Voting Rights Act[3] prohibits a state political subdivision from

2. The primary election is scheduled for August 15, 1992. Candidates must file applications with petitions to run for office by May 15, 1992.

3. Section 2 of the Voting Rights Act, as amended, provides as follows:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on

account of race or color, or [because he or she is a member of a language minority group].
(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other mem-

imposing any practices or procedures that "result in the denial or abridgement of the right to vote of any citizen who is a member of a protected class of racial and language minorities." *Thornburg v. Gingles,* 478 U.S. 30, 43, 106 S.Ct. 2752, 2762, 92 L.Ed.2d 25 (1986). Section 2(b) provides that a violation of subsection (a) occurs if the " 'totality of the circumstances' reveal that 'the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' " *Id.* (quoting 42 U.S.C. § 1973(b)). The legislative history explicitly indicates congressional intent that private parties have a right of action to enforce their rights under section 2. S.Rep. No. 417, 97th Cong.2d Sess. 30, *reprinted in* 1982 U.S.C.C.A.N. 177, 204 (Senate Report). Plaintiffs must show that "the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." *Id.* at 205. Although Congress specifically provided that the extent to which members of a protected class have been elected to office is one circumstance that may be considered, it warns that " 'nothing in [section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.' " *Id.* at 43, 106 S.Ct. at 2712.

According to the Senate Report that accompanied the 1982 amendments to the Voting Rights Act, the question to ask in determining whether a violation has occurred is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice."[4] *Id.* at 206. Proof of discriminatory intent is no longer required. *Chisom v. Roemer,* 501 U.S. ——, ——, 111 S.Ct. 2354, 2364, 115 L.Ed.2d 348, 363 (1991).

### 1. Application to an aggregate group of multiple minorities

Plaintiff claims that if African-Americans and Hispanics are combined, they are sufficiently numerous and geographically compact to create two safe "minority-majority" districts. Defendants argue that Congress did not intend section 2 to apply to a coalition of multiple minorities. In support, defendants provided the Court with two journal articles and a dissenting opinion in *United Latin Am. Citizens v. Midland Indep. Sch. Dist.,* 812 F.2d 1494, 1503 (5th Cir.), *vacated on different grounds,* 829 F.2d 546 (5th Cir.1987), purportedly criticizing application of section 1973 to an aggregate group of minorities.[5] However, I have found no cases in which a court has concluded that, regardless of whether commonality or cohesiveness could be proven, the statute was inapplicable to a coalition group of protected minorities. Although the legislative history of the Voting Rights Act does not explicitly address ap-

---

bers of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973.

**4.** The "results test" had been the legal standard governing voting discrimination cases prior to the Supreme Court's decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In *Mobile,* the Supreme Court held that plaintiffs had to show discriminatory intent. In 1982, Congress amended section 2 of the Voting

Rights Act, thereby abandoning the Supreme Court's requirement of showing that the challenged electoral law or structure was designed or maintained for a discriminatory purpose. The 1982 amendments restored the "results test" for determining whether a violation has occurred.

**5.** *See* Katharine I. Butler & Richard Murray, *Minority Vote Dilution Suits and the Problem of Two Minority Groups: Can a "Rainbow Coalition" Claim the Protection of the Voting Rights Act,* 21 Pac.L.Rev. 619 (1990); Rick G. Strange, *Application of Voting Rights Act to Communities Containing Two or More Minority Groups— When is the Whole Greater than the Sum of the Parts?,* 20 Tex.Tech.L.Rev. 95 (1989).

plication to aggregate groups of minorities, defendants have not convinced me at this time that the statute should not apply to a minority group coalition. There is nothing in the statute that prohibits application to an aggregate group of protected minorities. *Campos v. City of Baytown,* 840 F.2d 1240, 1244 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *see also Concerned Citizens v. Hardee County Bd.,* 906 F.2d 524, 526 (11th Cir.1990) (applying the Voting Rights Act to claims brought by a class of Hispanics and Black Americans); *United Latin Am. Citizens,* 812 F.2d at 1496 (application of Voting Rights Act to claims brought by a class of Mexican–Americans and Black Americans). It is my view at this juncture in the case that the congressional intent to bar voting discrimination on account of race, color, or national origin mandates application of the statute to a group consisting of various of these protected minorities, if sufficient commonality or cohesion between the groups is demonstrated.

■ The Act, as originally enacted in 1965, made it unlawful " 'to deny or abridge' " the right to vote " 'on account of race or color.' " *Chisom,* 501 U.S. at ——, 111 S.Ct. at 2362, 115 L.Ed.2d at 361 (quoting 79 Stat. 437). In 1975, Congress amended the statute to expand the ban on discrimination to include non-English speaking groups. *Id.* at —— – ——, 111 S.Ct. at 2362–63, 115 L.Ed.2d at 361–62 (citing 89 Stat. 402). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* 478 U.S. at 47, 106 S.Ct. at 2765. Section 2 provides a remedy for those excluded from meaningful political participation because of racism or prejudice.

■ As discussed by Judge Higgenbotham in his dissent to the majority opinion in *United Latin Am. Citizens,* 812 F.2d at 1504, section 2 does not automatically apply to all aggregate groups of minorities, but only to those coalitions in which there

is experienced "a common disability of chronic bigotry." *See also* Rick G. Strange, *Application of Voting Rights Act to Communities Containing Two or More Minority Groups—When is the Whole Greater than the Sum of the Parts?,* 20 Tex.Tech.L.Rev. 95, 112 (1989) ("Allowing unlimited aggregation may very well take the Voting Rights Act into the realm of interest group or coalition politics"). The purpose of section 2 is to prohibit election practices that result in minorities losing elections because of discrimination and exclusion, not because of fractioned political alliances. In other words, in order to establish standing to bring this case as an aggregate minority group, plaintiffs must show that the reapportionment challenged in this case was instituted by defendants to dilute plaintiffs' voting power because of defendants' common bigotry against both minorities.

When one minority group claims voting discrimination, such as a group of African–Americans, the members' common basis for claiming discriminatory inequality in the electoral process is apparent. When more than one minority group is claiming discrimination, the common basis is not so obvious. Plaintiffs must demonstrate that their "coalition" is not one merely of convenience for the purpose of bringing this lawsuit. They must show that "the two groups are indeed 'one' *and* that the reason for their status as a 'combined' discrete minority is their *shared* discriminatory treatment at the hands of the majority." Katharine I. Butler & Richard Murray, *Minority Vote Dilution Suits and the Problem of Two Minority Groups: Can a "Rainbow Coalition" Claim the Protection of the Voting Rights Act,* 21 Pac. L.Rev. 619, 649–50 (1990) (emphasis in original).

■ In determining whether the members of an aggregate minority group have experienced a "common disability of chronic bigotry," the Court should consider and balance the following factors: 1) whether the members have similar socio-economic backgrounds resulting in common social disabilities and exclusion; 2) whether the

members have similar attitudes toward significant issues affecting the challenged entity; 3) whether the members have consistently voted for the same candidates;[6] and 4) whether the minorities consider themselves "one" even in situations in which they could benefit independently, ie. would Hispanics be just as content with being 30% of the population in a district with 30% black as it would be if it had the opportunity to be a majority in a district?[7]

In their brief, plaintiffs summarily argue that because both Hispanics and African–Americans are protected groups under section 2, the statute should automatically apply to a claim that together they suffer from voting discrimination. Other than the evidence presented by the adoption of the reapportionment plan itself, plaintiffs provide little independent evidence of common discrimination, social disadvantage and political agenda in their brief. The only evidence offered in their brief is that, as Hispanics and African–Americans, they have a history of working together for common goals through the Committee for Responsive Government to support minority candidates.

However, in their affidavits and at the hearing,[8] plaintiffs submitted greater evidence of common discrimination and social exclusion. Plaintiffs submitted many affidavits to demonstrate prejudice in the community and social disadvantages shared by both Hispanics and African Americans. Out of these shared experiences have grown efforts to coordinate social programs and political agendas. Plaintiffs present evidence of housing discrimination against both Hispanics and African–Americans and the resulting formation of the Greater Grand Rapids Housing Corporation, organized to construct housing so that minority persons (unqualified) could purchase housing in Kent County. *See* Marshall Chavez, Virginia Schultz & Lee Nelson Weber[9] affidavits. Plaintiffs also submit evidence of the "common plight" between Hispanics and African–Americans in Kent County, "in such areas as under representation in all levels of government, home ownership, employment, [and] economic development." Lupe Ramos–Montigny affidavit. As a result of this common plight, plaintiffs' evidence demonstrates, Hispanics and Black Americans in Kent County have worked together in the Coalition for Representative Government, which is a "non-partisan group organization ... devoted to expanding opportunities for minorities to be involved in and influence the electoral process to address the inequities that have affected our community." *Id.;* George K. Heartwell & Noah Seifullah's affidavits. The Coalition's mission is to "help politically empower Grand Rapids area citizens who, by virtue of their race, heritage, nationality, or economic status, have been systematically excluded from the decision making process of local government bodies." Seifullah's affidavit. Included in the Coalition's work has been the successful campaign for a city commissioner in Grand Rapids, which is, of course, the major city in Kent County. Hartwell's affidavit. Plaintiffs have shown a history

6. *See* Rick G. Strange, *supra* note 4, at 129.

7. *See* Katharine I. Butler & Richard Murray, *supra* note 4, at 688.

8. Defendants object to many portions of some of the affidavits on the grounds that they contain hearsay statements which, pursuant to Federal Rules of Evidence 802, are inadmissible as evidence to support plaintiffs' motion for a preliminary injunction. Plaintiffs argue that in some instances, the statements are admissible as lay opinions under Rule 701, and that in others, the statements are admissible under an exception, Rule 803(24) because there are other assurances of trustworthiness. Defendants have not addressed each objection individually and a ruling is premature. Some have been disregarded by the Court as clear hearsay and others have been considered as lay opinions, but with appropriate weight given. Defendants' objections are preserved for specific rulings when the claims are addressed on their merits.

9. Lee Nelson Weber's affidavit includes evidence of housing discrimination on the basis of race documented in studies conducted by the Fair Housing Center of Greater Grand Rapids. Although it concludes there is an ongoing existence of "racial discrimination in housing both overt and covert to persons of color, including Hispanic and African–American citizens," it is not clear that the "racial" discrimination documented involved discrimination against Hispanics.

of discrimination in various city departments—ie., the police and fire department, but have failed to demonstrate evidence of official discrimination by county officials or the county government. Donald Reid, of the NAACP, has submitted evidence on behalf of plaintiffs indicating numerous incidents of prejudice and bigotry throughout the county affecting both racial and ethnic minorities. Additionally, plaintiffs have submitted evidence of racial and ethnic origin discriminatory attitudes in many city, county, and health care facility offices. Bobbie Butler's affidavit. The evidence indicates that the affirmative action program adopted by the City of Grand Rapids applies equally to *all* racial and ethnic minorities. *Id.* Finally, plaintiffs offer evidence of common health problems, higher than average high school drop-out rates, and lack of health insurance experienced to a significant degree by both African–Americans and Hispanics. Debra Nixon's affidavit.

I find that plaintiffs have demonstrated sufficient commonality for purposes of alleging a section 2 claim as an aggregate minority group.

### 2. Reapportionment results in discrimination

The next issue is whether plaintiffs have established a likelihood of success on the merits of their claim that, as a result of defendants' reapportionment of the electoral districts for the county commission, they are unable to elect representatives of their choice, in violation of section 2 of the Voting Rights Act. It is my conclusion that *at this time* plaintiffs have not submitted sufficient evidence to demonstrate a likelihood of success on this claim. They have failed to show that they will likely be able to prove that Hispanics and African Americans in Kent County vote cohesively as a bloc, such that the reapportionment plan effectively dilutes their voting power.

In *Chisom v. Roemer*, 501 U.S. at ——, 111 S.Ct. at 2365, 115 L.Ed.2d at 365, the Supreme Court held that in order to establish a section 2 claim, plaintiffs must demonstrate *both* that they have less opportunity to participate in the political process and that they have less opportunity to elect representatives of their choice.[10] In order to determine whether the reapportionment scheme results in plaintiffs not having an equal opportunity to participate in the political process and to elect the candidates of their choice, the Court must consider the totality of the circumstances.

The Senate Report that accompanied the 1982 amendments reinstating the "results test" sets forth a number of circumstances relevant to such an inquiry. Such circumstances include: the extent to which the political subdivision has been involved with official discrimination that touched the right of the minority group members to register, vote, or otherwise participate in the democratic process; the extent to which voting in the subdivision is racially polarized; the extent to which the subdivision has used unusually large election districts or other voting practices or procedures that may enhance the opportunity for discrimination against minority groups; the extent to which members of the minority group in the subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; the extent to which political campaigns have been characterized by racial appeal; and the extent to which members of minority groups have been elected to public office. Senate Report, *supra*, at 206–07.

In addition to consideration of the above circumstances, the Supreme Court has found that the Senate Report also indicated three specific limitations on the circumstances under which any section 2 violation may be proven: 1) electoral devices, such as at-large elections, may not be considered

---

**10.** Justices Scalia, joined by Chief Justice Rehnquist and Justice Kennedy, dissented on this point, arguing that it would constitute a violation if the government effectively excluded a minority from participation in an election, even though the minority was far too small to have a significant impact on the outcome. *Chisom,* at ——–——, 111 S.Ct. at 2370–71, 115 L.Ed.2d at 371–72.

per se violations; 2) the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation does not in itself establish a violation; and 3) plaintiffs must prove racial bloc voting. *Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764. In *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766–2767, the Supreme Court set forth criteria for establishing a section 2 violation in the context of a challenge to multi-member districting. First, the minority group must be sufficiently large and compact to constitute a majority in a single-member district. Second, the minority group must demonstrate that it is politically cohesive. And, third, the minority group must show that the white majority sufficiently votes as a bloc, such that absent special circumstances, it will usually defeat the minority's candidate of choice. *Id.*

The fact that neither African Americans or Hispanics, as a separate minority group, have sufficiently concentrated numbers to constitute a majority in two single-member districts is not fatal to plaintiffs' claim. Although both parties address and apply the *Gingles* analysis, I am not convinced that *Gingles* is entirely applicable to this case because, in contrast to the *Gingles* multi-member district scheme, the Kent County scheme at issue here involves reapportionment of single-member districts affecting an aggregate minority group. The *Gingles* requirements do not apply to all cases brought under section 2 of the Voting Rights Act. *See Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir.1990) (*Gingles* does not apply to claims of *intentional* discrimination); *Armour v. State of Ohio*, 775 F.Supp. 1044, 1052 (N.D.Ohio 1991) (*Gingles* requirement of a minority majority does not apply to single-member districting schemes) (three judge panel). A major concern of the *Gingles* court was to establish that there is no right to proportionate representation in a multi-member district. Such a concern is not paramount in single-member districts, especially when the minority group is an aggregate of more than one minority. Rather, the major concern in a case such as this, brought by plaintiffs who claim to be members of an aggregate minority, is whether the minority subgroups within the aggregate vote cohesively, such that consolidating their numbers in one district, and splitting or fracturing their numbers in another district, does, in fact, result in dilution of their voting power to choose candidates of their choice.

The inquiry into the cohesiveness of voting patterns is the same, however, in both a multi-district challenge and a single-district challenge. "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769. Evidence of the existence of racial bloc voting is very significant for two reasons. First, in districts with a white majority, a minority group would regularly be deprived of the opportunity to choose the candidate of its choice. Secondly, candidates chosen by white majorities could be completely indifferent to the needs of the minority group without fear of political repercussions. *Id.* at 48 n. 14, 106 S.Ct. at 2765 n. 14.

Obviously, a coalition of various minorities must bear a greater burden in order to prove that they vote as a cohesive bloc. I find that plaintiffs have not, at this point, satisfied their burden as to this element—they have not demonstrated with a likelihood of success that the aggregate minority group, including Hispanics and African Americans, of which plaintiffs claim to be members, votes as a racial bloc, or votes cohesively.

Even though plaintiffs have demonstrated common social problems indicative of common discrimination, at this time, I do not believe plaintiffs have submitted adequate evidence to demonstrate that Hispanics and African Americans support the same candidate and effectively vote as a bloc, or as a politically cohesive group. Plaintiffs have presented some evidence to indicate such, but the method, as described below, is questionable—I'm not sure that

it's any more than statistical manipulation with insufficient attention paid to the numerous variables that affect a population's vote. Moreover, plaintiffs' expert only analyzed the two groups' support for African American candidates, but did not analyze support for Hispanic candidates or nonminority candidates. Defendants also raise a potentially important point: in so far as the Hispanic population is made up of many nationalities and many relatively new citizens, there may be little cohesiveness among themselves. The fact that cohesiveness was found with the Hispanic population of Los Angeles, a city very near the Mexican–American border containing a majority of Mexican–Americans in its Hispanic population, does not mean cohesiveness exists within the Hispanic population of Kent County.

Plaintiff's expert, Allan Lichtman, provides an analysis of eight elections to demonstrate "the behavior of whites and blacks in Kent County through ecological regression ... to provide the information needed to estimate the voting of whites and blacks, respectively." Lichtman's affidavit # 1 at 2. Included in Lichtman's report is a table comparing the results of six of those various types of elections (county-wide, precinct, and district) in district numbers 17 (59% Black, 4% Hispanic) and 18 (46% Black, 19% Hispanic). Reflecting the greater minority population and the cohesiveness of the minority votes, the votes in favor of the minority candidate was significantly more in district 18 in every one of those elections.

In response to defendants' affiant, Nancy Giar, the Director of Elections for the Kent County Clerk's office, Lichtman specifically discussed the issue of how Hispanics vote and whether Hispanics and African–Americans vote cohesively. It is significant to note, however, that *both* experts, Lichtman and defendants' expert Ronald Weber, state that a lack of substantial Hispanic concentration in Kent County precludes separate, numerical estimates of Hispanic voting pursuant to bivariate eco-

logical regression or the extreme case methods of analysis.[11]

However, in response to what Lichtman refers to as Giar's analysis of "African American precincts" and "Hispanic precincts," Lichtman attempts to compare the support that African Americans give to African American candidates with the support given by Hispanic voters. Lichtman criticizes Giar's analysis because the mean percent of the African American voting age population in the African American precincts was 87.0%, whereas the mean percent of the Hispanic voting age population in the Hispanic precincts was only 24.3%. Lichtman argues that because of this demographic disparity, Giar's conclusions about the relative lack of support for black candidates in the Hispanic precincts are not accurate. Lichtman attempts to correct for this. He selected the 8 most heavily Hispanic districts analyzed by Giar and added the black population in those districts to compute an aggregate minority percentage. For purposes of comparison, he selected 8 control precincts with comparable minority percentages, but where the largely predominant minority group was African American and where the Hispanic population was relatively low. He then examined support for the African American candidate in the Hispanic and control precincts for six elections in which regression analysis indicated that a majority of minorities supported African American candidates, whereas a majority of whites (about 75%) supported white candidates. The results of his analysis show comparable support for the African American candidate in the precincts with a large Hispanic voting population. Defendant's expert, Ronald E. Weber, however, states that these figures could also represent partisan white support in those districts. In the one non-partisan election Lichtman analyzed (election for a district court judge), almost across the board there was significantly more support for the African American candidate in the predominantly African American precincts

11. In *Gingles,* the Supreme Court upheld the use of bivariate ecological regression to demonstrate a correlation between race of voters and the selection of certain candidates. *Gingles,* 478 U.S. at 61–77, 106 S.Ct. at 2771–2780.

than in the precincts with a large Hispanic population (in the African American precincts there was an average of 44.77% support, whereas in the precincts with a large Hispanic population there was only an average of 31.66% support).

Defendants' expert, Ronald E. Weber, focused on whether African Americans consistently support Hispanic candidates. He analyzed seven recent elections in which there was at least one Hispanic candidate.[12] Weber uses two methods: bivariate ecological regression (also used by Lichtman) and extreme case precinct analysis. Weber's analysis shows that African Americans do not cohesively support Hispanic candidates. Even though they do rank Hispanic candidates higher than White candidates, it could only be a very minimal percent of the population. The only exception is the 1990 primary, county-wide election for an unexpired two-year term on the school board where one hispanic and one white candidate competed for the seat. Generally, defendants' expert observes that in county-wide elections where only one African American candidate was running, but two or three slots had to be filled, the African Americans only cast one or two votes. Weber concludes that rather than voting cohesively with the Hispanics, "the black voters bullet vote for black candidates and enhance the value of that vote by failing to vote generally for the other candidates." Weber's affidavit at 20. As pointed out by Weber, African American support has been insufficient to enable an Hispanic candidate to win any election, even though a number of the African American candidates have won.

The parties' experts also strongly disagree as to the existence of a white voting bloc in the Kent County election districts. Lichtman analyzed eight various elections and found significant polarization between African American voter choices and White voter choices when an African American candidate was running. Weber, on the other hand, looked at 15 elections (all the elections in which a minority candidate participated in the last eight years), including a number of non-partisan elections.

Lichtman states that his results are comparable to Weber's results in the seven single-seat, general elections that they both analyzed.[13] Neither expert analyzed, however, whether Whites vote as a bloc to defeat Hispanic candidates. Weber's ecological regression results of county-wide voters show that a mean of 79% of whites bloc voted for white candidates and a mean of 21% crossed over to vote for African American candidates. Lichtman's ecological regression results for the minority impact area show that a mean of 75% of whites bloc voted for white candidates and a mean of 25% percent crossed over to vote for African American candidates. It is noteworthy, however, that in a county-wide ecological regression analysis of voters in a general election in which a White candidate was on the Democratic ticket and a conservative African American candidate was on the Republican ticket, 40% of the Kent County White voters voted for the African American candidate, compared to only about 20% of the African American voters voting for the African American candidate. Clearly, race is not the only, and, perhaps, not always the primary, factor. What needs to be focused on when analyzing white bloc voting is whether the minority group's candidate choice, regardless of race, is usually defeated by white bloc voting. However, when the candidate is not a minority member, it may be difficult to distinguish between a preferential vote and a vote cast by default, or as the lesser of two evils. And certainly, a conservative, Republican minority candidate is the exception and not the rule.

In all ten of the non-partisan elections where African American candidates have competed, single seat and multi-seat, Weber's results show that the black voters' candidates of choice have been elected.

---

**12.** Weber analyzed nine elections, but in two of those elections, the candidate he thought was Hispanic was not. Accordingly, those elections have been disregarded in this analysis.

**13.** The single-seat elections are especially relevant to the single-seat election at issue in this case.

The results of these non-partisan elections, especially the single seat, raise questions regarding the existence of white bloc voting in the single-seat, non-partisan election at issue.

As to factors other than racial bloc voting, plaintiffs do submit some evidence regarding social disabilities that could affect plaintiffs' ability to effectively exercise their voting rights—as discussed above. In the late 1960s through approximately 1978, two minority county commissioners were elected to office. One represented a minority majority district. The other represented a white majority district. During the 1980s, there was only one minority county commissioner elected to office, and he was a representative of a minority majority district. A minority candidate ran for county commissioner in another district once during the 1980s and lost.

Forming a district containing more than a 75% minority population, when none of the other districts have even a 30% minority population, certainly forms the basis for a significant inference of an effort to dilute minority voting power in the surrounding districts. Plaintiffs' affiant, Donald Reid, also testifies to some evidence of racial appeals in past state campaigns—one involving the state legislature in which pictures of Mayor Young, an African American mayor representing Detroit, were displayed as some sort of "warning." Although such evidence is significant to this Court and raises serious concerns about the responsiveness of the Kent County officials to the County's minority population, it cannot support a finding that plaintiffs have demonstrated a likelihood of success on the merits of a section 2 Voting Rights Act claim without a better showing regarding racial bloc voting by the aggregate group of Hispanics and African Americans. Additionally, there is no evidence regarding white bloc voting in relation to Hispanic candidates in either single-seat, or multi-seat elections. Finally, plaintiffs have not shown that Hispanics and African Americans do not have equal opportunity to participate in the electoral process in Kent County.

### B. Irreparable Injury

Plaintiffs must demonstrate that if the preliminary injunction is not ordered, they will suffer irreparable harm. Although perhaps sufficient to establish standing to assert a cause of action alleging a Constitutional violation, merely *alleging* risk of injury is not sufficient to entitle plaintiff to a preliminary injunction. "[A] plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988) (emphasis in original) (citation omitted). While there is no set definition of "irreparable injury," *see e.g., City of Benton Harbor v. Richardson*, 429 F.Supp. 1096 (W.D.Mich.1977), there is a characterization which aids in determining whether irreparable injury exists. "The moving party must demonstrate a noncompensable injury, for which there is no legal measure of damages, or none that can be determined with a sufficient degree of certainty.... The injury must be both certain and great...; it must be actual, and not merely theoretical." *Merrill Lynch, Pierce, Fenner & Smith v. E.F. Hutton*, 403 F.Supp. 336, 343 (E.D.Mich.1985) (citations omitted). Mere money injuries are insufficient. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974).

Insofar as plaintiffs could prove that the reapportionment scheme was illegal—ie., they demonstrated that Hispanics and African Americans voted cohesively as a bloc and that the white majority voted cohesively as a bloc to usually defeat the aggregate minority group's candidate choice—plaintiffs would suffer irreparable harm if defendants were not enjoined from conducting the election with the reapportionment scheme in place. Plaintiffs' rights to equally participate in the democratic process of choosing elected representatives would be harmed and the harm to their civil rights would be irredeemable. However, because plaintiffs have not presented a strong case demonstrating racial bloc voting at this point, and because their evidence regarding other discrimina-

tion affecting plaintiffs' voting rights is also weak, I believe that the risk of exposure to irreparable harm is not that great. There is just too little evidence demonstrating that African Americans and Hispanics support each others' candidates and that a district with an aggregate majority will result in a greater likelihood of them being able to choose a candidate of their choice.

## IV. Conclusion

Because plaintiffs have demonstrated little likelihood of success on the merits, the risk of irreparable harm is low. Thus, any benefits to the public by granting the injunction are small at this time. I am not incognizant, however, that there may be some benefit to encouraging an aggregation of these two minority groups and the efforts of their hard-working representatives. If plaintiffs had demonstrated significant evidence of racial bloc voting by an aggregate group of Hispanics and African Americans and had shown other particularized evidence of chronic exclusion and discrimination within Kent County, the balance of factors would certainly weigh in favor of granting a preliminary injunction. Although concerns for maintaining a balance of powers among the various branches of government weigh against judicial interference with local government electoral districting, *see White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) (federal court should follow state laws regarding reapportionment "whenever adherence to state policy does not detract from the requirements of the Federal Constitution), I cannot see how the Kent County population would effectively be harmed by having two out of 21 districts with minority-majorities. Racial gerrymandering is the most devastating form of discrimination and is absolutely intolerable under the Constitution.

Any harm to third parties would certainly be greatly outweighed by the public benefits, if, in fact, racial gerrymandering were shown. I do not imagine the county commissioners receive significant reimbursement, so salary would not seem to be a factor to consider in deciding whether an increase in the districts from 19 to 21

would be in the public interest. The primary concern is compliance with constitutional and state law requirements.

It is my conclusion, however, that plaintiffs have not satisfied their burden. After consideration of all the relevant factors, I conclude that plaintiffs' motion for a preliminary injunction should be denied.