EDITH H. JONES, Circuit Judge,
with whom JOLLY, SMITH, BARKSDALE and DeMOSS, Circuit Judges,
join in concurring in majority opinion:
Judge Higginbotham’s excellent opinion resolves all but one of the issues in dispute between the parties, and I am pleased to concur in it as far as it goes. The single issue that I believe should have been discussed is whether different racial or language minority groups may be permitted to aggregate their strength in order to pursue a Section 2 vote dilution claim. Permitting such a black/Hispanic coalition claim was vital to plaintiffs’ success in three counties in this case. The issue was preserved for appeal, albeit as an aside to the all-pervasive issues;[1] it furnishes an alternate ground of decision in the three counties. I believe the en banc court should lay to rest the minority coalition theory of vote dilution claims.[2]
Congress did not authorize the pursuit of Section 2 vote dilution claims by coalitions of distinct ethnic and language minorities. What Congress did not legislate, this court cannot engraft onto the statute. Except in two eccentric decisions from Texas, the coalition theory has found no factual support anywhere else in the federal courts. The crucial problem inherent in the minority coalition theory, articulated by Judge Higginbotham and realized in this case, is that it transforms the Voting Rights Act from a statute that levels the playing field for all races to one that forcibly advances contrived interest-group coalitions of racial or ethnic minorities.
According to customary legal analysis, there should be no need to discuss the minority coalition theory of vote dilution because the text of the Voting Rights Act does not support it. The Act originally protected only black voters. When it was amended in 1975 to reach language minorities, the Act then identified four new covered groups: persons of Spanish heritage; all American Indians; “Asian Americans” including Chinese, Japanese, Korean and Filipino Americans; and Alaskan natives. 42 U.S.C. § 1973(b)(f)(1). That each of these groups was separately identified indicates that Congress considered members of each group and the group itself to possess homogeneous characteristics. By negative inference, Congress did not envision that each defined group might overlap with any of the others or with blacks. See Hunter, The 1975 Voting Rights Act and Language Minorities, 25 Cath.U.L.Rev. 250, 254-57 (1986); Katherine I. Butler and Richard Murray, Minority Vote Dilution Suits and the Problem of Two Minority Groups: Can a “Rainbow Coalition” Claim the Protection of the Voting Rights Act?, 21 Pac.L.J. 619, 624-25 (1990) (hereafter, “Butler and Murray”).
The 1982 amendment to Section 2, which codified the “results” test, likewise offers no textual support for a minority aggregation theory. It speaks only of a “class of citizens” and “a protected class.” 42 U.S.C. § 1973(b). Had Congress chosen explicitly to protect minority coalitions it could have done so by defining the “results” test in terms of protected classes of citizens. It did not.
Two arguments have been made for extending the Voting Rights Act to minority coalitions. First, one appellate panel stated, without citation or further reasoning, that the Act does not prohibit such claims. Cam *895 pos v. City of Baytown, Tex., 840 F.2d 1240, 1244 (5th Cir.), reh’g denied, 849 F.2d 943 (5th Cir.1988), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). The Act does not prohibit claims by minorities from the Indian subcontinent either. But as Judge Higginbotham pointed out, this is answering the wrong question. The proper question is whether Congress intended to protect coalitions. Campos, 849 F.2d at 945 (Higginbotham, J. dissenting from denial of reh. en banc). “The fact that both groups are protected does not justify the assumption that a new group composed of both minorities is itself a protected group,” Butler and Murray, supra, at 647. Judge Higginbotham explained the distinction:
In deciding to protect language minorities, Congress recognized that language and racial minorities share many disabilities. To assume, however, that a group composed of both minorities is itself a protected minority is an unwarranted extension of congressional intent. A group tied by overlapping political agendas but not tied by the same statutory disability is no more than a political alliance or coalition.
849 F.2d at 945.
The second argument advanced by a court that permitted a minority coalition claim under Section 2 begs the question of statutory construction altogether. This position asserts that because a minority coalition may meet the three-prong Gingles test, including the criterion of the minority group’s political cohesiveness, it may gain relief from vote dilution.[3] This argument was successful in a Texas ease in which, paradoxically, the court also acknowledged that Gingles says nothing about the possibility of granting relief to minority group coalitions.[4] Previously, it had rejected a plan offered by the plaintiffs that contained a mixed black/Hispanic district, because it found the interests of these two minorities too divergent to justify their submergence in one district. Nevertheless, it predicated a new, inexplicably opposite finding on Gingles’ second prong and determined that the coalition of blacks and Hispanics was politically cohesive. League of United Latin American Citizens v. Midland Indep. Sch. Dist., 648 F.Supp. 596, 606 (W.D.Tex.1986).[5] Again, Judge Higginbotham noted the court’s error in purporting to rely on Gingles:
[Gingles[7]] three-step inquiry assumes a group unified by race or national origin and asks if it is cohesive in its voting. If a minority group lacked common race or ethnicity, cohesion must rely primarily on shared, values, socioeconomic factors, and coalition formation, making the group almost indistinguishable from political minorities as opposed to racial minorities.
Midland, 812 F.2d at 1504. Reliance on Gingles is false because Gingles does not address the meaning of or solution to vote dilution of a minority coalition.
A principal reason for distinguishing homogeneous, explicitly defined minority groups from minority coalitions lies in Section 2 itself. One may be uncertain what Congress might think about permitting minority coalitions to assert vote dilution claims, but Congress clearly walked a fine line in amending Section 2 to codify the results test for vote dilution claims while expressly prohibiting proportional representation for minority groups. The results test of vote - dilution inherently recognizes that a minority group will sometimes fail to merit a single member district solely because they lack the population to “constitute a majority in a single member district.” Gingles, 478 U.S. at 50 and n. 17, 106 S.Ct. at 2766 and n. 17. *896 Permitting Section 2 claims by opportunistic minority coalitions, however, artificially escapes this hurdle. As a result, the remedy afforded to the coalition may easily cross the line from protecting minorities against racial discrimination to the prohibited, and possibly unconstitutional, goal of mandating proportional representation.[6]
The tension in Section 2 between the results test and the prohibition of proportional representation fundamentally distinguishes this case from Chisom v. Roemer, — U.S. -, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), in which the Supreme Court concluded that judicial elections are covered by Section 2. Stating that certain types of elections are within Section 2 is a definitional exercise. In Chisom, the Court held that judicial elections, having once been covered by the Act, remained covered following the 1982 amendment to Section 2. But it is a remedial exercise to decide whether to apply the results test to a minority coalition united not by race or language but only by their desire to advance a particular agenda. Enlarging the permissible boundaries of Section 2 relief to encompass minority coalitions thus runs headlong into the Section 2 prohibition of proportional representation, creating a conflict that the Supreme Court did not face in Chisom.
If Section 2 is held to permit relief for minority coalitions, the complications for Voting Rights Act litigation in our increasingly multi-ethnic society will be enormous. Those complications alone imply that Congress, rather than the courts should first address any such innovation. Certain questions should give pause even to the advocates of minority coalitions. As Judge Higginbotham observed, the availability of a minority coalition theory could be a defense against an attack on an at-large system. Campos v. City of Baytown, Texas, supra 849 F.2d at 945-46 (Higginbotham, J.). Where the combined groups comprise more than half of a voting population in a plausible single-member district, their “cohesion” could be used as a device to “pack” the minorities together. Further, on what basis would a court apportion districts in the wake of a successful minority coalition Section 2 suit? If each minority is given an opportunity to prevail in a district, is this not an admission that the coalition is ephemeral and not really “cohesive” as Gingles requires? Is it possible that greater racial animosity will develop if a court permits minority aggregation on too insubstantial a basis and effectively submerges members of one group in a district controlled by the other group? Courts should be loath to embark upon coalition redistricting with no expressed guidance from a statute that reflects the will of the American people.
If, notwithstanding the absence of Congressional authorization, minority coalitions are permitted to assert aggregate Section 2 vote dilution claims, relief must be predicated on more evidence of the group’s homogeneity than the maintenance of a joint lawsuit. See note 5, supra. This is so for two reasons. As noted earlier, if a fortuitous coalition of minorities can gain Section 2 relief on tenuous proof of cohesion, the courts will have effectively undone Congress’s explicit disapproval of proportional representation. The less cohesive the groups truly are, the more likely relief has been fashioned only because of the groups’ joint minority status. Second, there is risk to members of the minority groups themselves if their electoral"fates are joined even though they do not share fundamentally similar social and political goals. To be sure, the problem of determining minority political cohesiveness under Gingles may be difficult even when the claims of one minority group are at issue.[7] But it should be self-evident that the problem is corn- *897 pounded when different minority groups, with radically different cultural and language backgrounds, socioeconomic characteristics and experiences of discrimination seek Section 2 coalition status. Forcibly merging fundamentally different groups for the purpose of providing “minority” representation could be a cruel hoax upon those who are not cohesive with self-styled minority spokesmen.
The difficulty of proving vote dilution on behalf of coalitions of minorities has been vividly realized in practice. Except in the Midland and Campos cases, there appear to be no reported decisions in which sufficient proof of the minority coalition theory was adduced to justify Section 2 relief. The theory has been litigated all over the country, but it has repeatedly been rejected on factual grounds. See Concerned Citizens of Hardee County v. Hardee County Bd. of Commissioners, 906 F.2d 524 (11th Cir.1990); Latino Political Action Committee v. City of Boston, 609 F.Supp. 739, 744 (D.C.Mass.1985) aff'd, 784 F.2d 409 (1st Cir.1986); Butts v. City of New York, 614 F.Supp. 1527, 1546 (D.C.N.Y.1985), reversed on other grounds, 779 F.2d 141 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740; Badillo v. City of Stockton, 956 F.2d 884, 886 (9th Cir.1992); Romero v. City of Pomona, 665 F.Supp. 853, 859 (D.C.Cal.1987), aff'd, 883 F.2d 1418 (9th Cir.1989). See also Nixon v. Kent County, Michigan, 790 F.Supp. 738 (W.D.Mich.1992) in which Judge Enslen, author of a well-known constitutional law treatise, thoughtfully concluded that the only proper test for minority aggregation is whether two minority groups “are indeed one.” 790 F.Supp. at 743.[8] Even in Texas, before this ease, the success of the Midland and Campos plaintiffs was unique. See Over-ton v. City of Austin, unpublished, 1987 WL 54389, aff'd, 871 F.2d 529 (5th Cir.1989) (rejecting black/Hispanic coalition case in part because evidence showed that each group voted for candidates of their own race but not for candidates of the other race.)
What this string of defeats suggests, if not the utter bankruptcy of Section 2 minority coalition claims, is at least their factual complexity. Once the courts plunge into the business of apportioning representation among racial or ethnic coalitions, a host of difficult and potentially divisive social questions rear their heads. A finding of political cohesiveness should require such coalitions to prove, at the very minimum, not only that they usually vote for the preferred candidates of their own ethnic group but also for those of the coalition group — otherwise, the groups cannot be politically cohesive. Not only do most of the above-cited decisions case doubt on such a proposition, but considerable sociological literature also demonstrates “social distance” between minority groups that seems inconsistent with widespread coalition minority political cohesion.[9]
The second panel opinion in this Lulac case concedes that
the procedure of allowing Blacks and Hispanics to proceed as a “coalition” minority . group in a Section 2 claim is fraught with risks.
Lulac III, 986 F.2d at 785, n. 43. Ironically, while citing the Butler and Murray article to which I have referred, the panel makes no use of its cautionary data or its conclusion:
Proponents of coalition dilution suits argue that minority groups are natural allies because of their shared exclusion from the dominant society, and their similar lower socioeconomic status, which, proponents maintain, is a product of past discriminá *898 tion. Despite the simplistic logic of this position, it does not comport with the reality revealed by social science studies. Those studies suggest just the opposite. The rarity of documented political alliances between minority groups is the natural consequence of differences in their attitudes and perceptions. Studies indicate that minorities in fact identify more closely with the dominant group than with other minorities. Moreover, perceptions of discrimination vary widely among groups. Blacks, for example, are much more likely than Mexican Americans to perceive themselves to be victims of discrimination. Still other studies suggest that the underlying causes of lowered socioeconomic status differ among minority groups. Different root causes of poverty are likely to lead to different, possibly even conflicting, demands on the government.
Butler and Murray, supra, 688-89. Butler and Murray contend that because of these differences, minority coalitions “very seldom” ought to be able to prove vote dilution under Section 2. Butler and Murray, supra at 687. The short answer to plaintiffs’ joint Section 2 claims in Lubbock, Ector and Midland Counties is that they did not meet their burden of proof that blacks and Hispanics are sufficiently like a single minority group to entitle the coalition to one judicial district in each county.

Conclusion

The Congressional compromise that resulted in the passage of Section 2 left the field of voting rights wide open to courts in many respects. Congress did not, however, contemplate or authorize relief for coalitions of racial and language minority groups. For the courts to provide such relief, in my view, judicially amends the Act and flies in the face of the express prohibition of proportional representation in Section 2. At the very least, only under very convincing proof of a minority coalition’s sociological similarities and goals as well as its political cohesion can such a claim be made. In this case, plaintiffs have not carried their burden of proof concerning Lubbock, Midland or Ector Counties. Our court’s previous decisions in Midland and Campos must be overruled. With these additional observations, I concur in the majority opinion.

. Although the era banc majority opinion adopts the minority coalition theory for certain aspects of its analysis, those points are not essential to its result and simply demonstrate that the plaintiffs' own arguments are self-contradictory.

. The Supreme Court has acknowledged but not addressed the minority coalition theory. Growe v. Emison, -U.S.-, 113 S.Ct. 1075, 1085, 122 L.Ed.2d 388 (1993). Judge Higginbotham has twice advocated era banc consideration of this issue. See League of United Latin American Citizens v. Midland I.S.D., 812 F.2d 1494, 1503-09 (Higginbotham, J. dissenting), aff'd in part on other grounds, 829 F.2d 546 (5th Cir.1987) (era banc); Campos v. City of Baytown, Texas, 849 F.2d 943 (5th Cir.1988) (Higginbotham, J., dissenting from denial of rehearing en banc). In neither case, for procedural reasons, did the court acquiesce. I endorse Judge Higginbotham’s earlier writings.

. A general citation to Thornburg v. Gingles, the Supreme Court's decision on vote dilution, is superfluous at this point in our court's writing.

. Butler and Murray, supra at 642, observe that before the Midland case, blacks and Hispanics had pursued Voting Rights Act cases together, but they had sought separate districts or relief for each minority.

. The court’s finding on political cohesiveness was supported only by this:
... Blacks and Hispanics worked together and formed coalitions when their goals were compatible. Additionally, the bringing of this lawsuit provides evidence that blacks and Hispanics have common interests that induce the formation of coalitions. Id.
Butler and Murray term “shocking” the court's reliance only on the facts that suit has been brought jointly and that the minority groups are willing to work together to accomplish “compatible" goals. Butler and Murray, supra at 667.

. The Midland case illustrates this point. The district court approved a "remedy”
in the form of the best available single member district to each of the two groups, even though neither could satisfy [Gingles'] requirements of size and compactness.... Ironically, Section 2, which specifically disavows a right to proportional representation, was used to provide greater than proportional representation for two groups, neither of whom would have qualified for a seat had proportional representation actually been the law.
Butler and Murray, supra, 667-68 (emphasis added).

. See, e.g., Butler and Murray, 651-57, 674-87, describing the diverse socioeconomic and ethnic qualities among our Hispanic population.

. The court in Nixon looked to the following factors, gleaned from the definition of minority group:
(1) Whether the members have similar socioeconomic backgrounds resulting in common social disabilities and exclusion;
(2) whether members have similar attitudes toward significant issues affecting the challenged entity;
(3) whether members have consistently voted for the same candidates; and
is whether the minorities consider themselves "one” even in situations in which they would benefit independently.
Nixon at 790 F.Supp. 744.

. See, e.g., Dyer, Dedlitz and Worochel, Social Distance Among Racial and Ethnic Groups in Texas, Some Demographic Correlates, 70 Social Science Quarterly 607, 613-14 (1989); Donald L. Horowitz, "Conflict and Accommodation: Mexican Americans Need Cosmopolis" in Mexican Americans in Comparative Perspective 58, 84-92 (1985) See also Butler and Murray, supra n. 7.